[No 20919.   In Bank. — September 2, 1892.]

THE PEOPLE, RESPONDENT, *v.* WONG ARK, APPELLANT.

CRIMINAL LAW — TRIAL — CHALLENGE FOR ACTUAL BIAS — EXCEPTION — REVIEW UPON APPEAL — CONSTITUTIONAL LAW. — Under the terms of section 1170 of the Penal Code, no exception is allowed to a defendant from a ruling of the trial court denying a challenge for actual bias. Whether that section is unconstitutional in depriving the defendant of a right to except to such ruling, and to complain thereof upon appeal, not decided.

ID. — PROOF OF ACTUAL BIAS — PROPER DENIAL OF CHALLENGE. — To establish actual bias upon the part of a juror, there must be shown the existence of a state of mind on his part in reference to the case, or to either of the parties, which will prevent him from acting with entire impartiality, and without prejudice to the substantial rights of either party; and where the testimony fails to show that there existed in the mind of a juror any prejudice, either with reference to the facts of the case or the parties to the action, a challenge for actual bias is properly denied.

ID. — HOMICIDE — EVIDENCE — DECLARATION OF DECEASED — RES GESTÆ. — Upon the trial of a defendant charged with murder, where a police officer had testified to the effect that after the shooting he ran to the place where the deceased was lying, a distance of about 140 yards, and had a conversation with her for about a half a minute, and that when he reached her there were several persons present, his testimony that the deceased then declared that the defendant was the man who had shot her, such declaration, not having been made in the presence of the defendant, nor as a dying declaration, is not admissible as part of the *res gestæ.*

ID. — DETERMINATION OF RES GESTÆ — NECESSARY INCIDENT OF LITIGATED ACT — NARRATIVE OF PAST EVENT. — In the determination of what acts or declarations are part of the *res gestæ,* each case must be considered upon its own peculiar facts. The distinguishing feature is, that the declarations or acts should be necessary incidents of the litigated act, in the sense that they are part of the immediate concomitants or conditions of such act, and not produced by the calculated policy of the actors. It is not permissible to introduce, under the guise of *res gestæ,* a narrative of past events, made after the events are closed, or a declara-

tion which is not the fact talking through the party, but the party's talk about the facts.

ID. — IMPANELMENT OF JURY — PEREMPTORY CHALLENGES — DISCHARGE OF SWORN JURORS FOR ILLNESS. — Where, during the impanelment of the jury, and after nine jurors had been selected and sworn to try the case, two of them were excused on the ground of sickness, and additional men were called to fill the panel, but at the time the jurors were excused the defendant had exercised but nine of the twenty peremptory challenges allowed him by law, and when eleven jurors had been selected, the defendant had exercised eleven more peremptory challenges, making twenty in all, it was error for the court to refuse to allow the defendant peremptorily to challenge the twelfth juror, he being entitled to twenty peremptory challenges after the discharge of the two jurors for illness.

APPEAL from a judgment of the Superior Court of Los Angeles County, and from an order denying a new trial.

The facts are stated in the opinion of the court.

*Jesse Hardesty*, for Appellant.

*Attorney-General W. H. H. Hart, George P. Phibbs*, and *Deputy Attorney-General William H. Layson*, for Respondent.

PATERSON, J. — The appellant was convicted of murder, and sentenced to imprisonment in the state prison for life. A motion for a new trial was made and denied, and from the order denying the motion, and from the judgment, the defendant has appealed.

The appellant's chief contention is, that the court abused its discretion in overruling the defendant's challenge for actual bias, made to several of the persons who were examined as to their qualifications to serve as jurors. Section 1170 of the Penal Code does not provide for an exception to a challenge for actual bias, and it has been held here in several cases that there is no exception, and that there can be no review of the ruling upon such a challenge. The appellant contends, however, that the section referred to is unconstitutional and void, because "it deprives the accused of the right to except to the decision of the trial court in disallowing a

challenge for actual bias, urged by the accused against
a proposed juror, and takes away from the accused the
safeguard of a trial by an impartial jury, and deprives
him of his life or liberty 'without due process of law.' "
But we are not called upon to determine the constitution-
ality of the act.   We have examined the testimony of
each juror given upon his *voir dire,* and are satisfied
that the challenges were properly denied.   To establish
actual bias there must be shown "the existence of a state
of mind on the part of the juror in reference to the case,
or to either of the parties, which will prevent him from
acting with entire impartiality, and without prejudice to
the substantial rights of either party."   (Pen. Code, sec.
1073.)   The testimony fails to show that there existed
in the mind of any of the jurors any prejudice, either
with reference to the facts of the case or the parties to
the action.

At the trial a police-officer of the city of Los Angeles
was permitted to testify that after the shooting he ran
to the place where the deceased was lying on the porch
(a distance of about 140 yards), and " had a conversation
with her for possibly half a minute or a little longer";
that when he reached the place where she was lying
there were several persons present.   Against the objec-
tion of the defendant, the witness was permitted to state
that the deceased declared that the defendant was the
man who had shot her.   This ruling of the court was
erroneous.   The declaration was not made in the pres-
ence of the defendant, and it was not admissible as a
dying declaration, because no foundation therefor was
laid.   If admissible at all, it was only as a part of the
*res gestæ.*

It is often difficult to determine what acts or declara-
tions are part of the *res gestæ.*   There is an apparent
conflict in the authorities on the subject.   Each case
must be determined upon its own peculiar facts.   Whar-
ton says: "The distinguishing feature of declarations of
this class is, that they should be necessary incidents of
the litigated act,—necessary in this sense, that they are

part of the immediate concomitants or conditions of such act, and are not produced by the calculated policy of the actors. . . . . The rule before us, however, does not permit the introduction, under the guise of *res gestæ*, of a narrative of past events, made after the events are closed, by either the party injured or by the by-stander." At the time the declaration referred to was made, the shooting had been done, and the assailant had escaped from the scene of the shooting. The declaration was not the fact talking through the party, but the party's talk about the facts. (Wharton's Crim. Ev., secs. 266, 691.) The subject under consideration was carefully considered by Mr. Justice Sharpstein in *People* v. *Ah Lee*, 60 Cal. 85, and the views therein expressed we think are correct, and applicable to the case at bar.

During the impanelment of the jury, and after nine jurors had been selected and sworn to try the case, two of the jurors were excused on the ground of illness. At that time the defendant had exercised nine of the twenty peremptory challenges allowed him by law. The remaining seven jurors were retained, and additional men were called to fill the panel. When eleven jurors had been sworn to try the case, the defendant had exercised, in all, twenty of the peremptory challenges. The defendant attempted to excuse by peremptory challenge the twelfth juror called, but the court held that he had already exhausted the peremptory challenges allowed him by law, refused to allow the challenge, and directed the clerk to swear the juror, which was done.

The court erred in not allowing the defendant to exercise the peremptory challenge. (Pen. Code, sec. 1123; *People* v. *Stewart*, 64 Cal. 61; *People* v. *Brady*, 72 Cal. 492.)

We have examined the instructions given to the jury, and think they state the law applicable to the case fully, fairly, and correctly.

The judgment and order are reversed, and the cause is remanded for a new trial.

mental principle, that the constitution, laws, and treaties of the United States are the supreme law of the land, it seems to us almost absurd to contend that a power given to a person or corporation by the United States may be subjected to state taxation. The power conferred emanates from, and is a portion of, the government that confers it." And again, the court, speaking of the taxation of a franchise, say: "It has no limitation but the discretion of the taxing power. The value of the franchise is not measured like that of property, but may be ten thousand or ten hundred thousand dollars, as the legislature may choose. Or without any valuation of the franchise at all, the tax may be arbitrarily laid. It is not an idle objection, therefore, made by the company against the tax imposed in the present case." Under this decision, therefore, it is entirely clear that if the appellant is an instrument of the national government, within the meaning of *McCulloch* v. *Maryland,* 4 Wheat. 316, or has franchises granted by that government for national purposes, then the tax involved in the case at bar cannot be maintained.

The remaining question of importance is this: Are the relations of appellant to the national government, and its franchises derived therefrom, of such character as to bring it within the principles of the cases above cited? We think that the decisions of the supreme court of the United States answer this question in the affirmative. Indeed, the very case of *California* v. *Central Pacific R. R. Co.,* 127 U. S. 1, to which we have just referred, seems to be itself a determination of the point in favor of appellant; for a comparison of the railroad acts, which were held in that case to have conferred franchises upon the railroad company, with the act of July 24, 1866, respecting telegraph companies (hereinbefore mentioned), shows that the difference between the rights and powers granted in the two instances is a difference of degree only, and not of kind. An interstate railroad is a thing of more magnitude, and has greater financial and commercial value, than an interstate line of wires and poles

used for telegraphy. The transportation of troops and munitions of war is, no doubt, a thing of graver importance than the transmission of telegraph messages; but the latter has become also an absolute necessity to the proper administration of the national government, either in peace or war. If, therefore, as was held in the decision last mentioned, the rights, privileges, and powers conferred by Congress on the railroad company constitute franchises which a state cannot tax, it seems impossible to escape the conclusion that the rights, privileges, and powers thus conferred upon the appellant also constitute such franchises.

But the supreme court of the United States has had occasion to declare the character and position of the appellant, with respect to the question here involved, in cases in which the appellant itself was a party to the record.

In December, 1866, the legislature of Florida passed an act granting to the Pensacola Telegraph Company "the sole and exclusive right and privilege" of maintaining lines of electric telegraph through certain parts of that state. There was nothing in the state constitution of Florida which prohibited its legislature from granting such exclusive privileges within its own jurisdiction. Afterwards a certain railroad company granted the right to erect a telegraph line along its right of way to the Western Union Telegraph Company, the appellant in the case at bar. The latter company had commenced the erection of the line when the said Pensacola company commenced an action in the United States circuit court to enjoin the work, on account of its alleged exclusive right under said act of the legislature of Florida, with which the proposed line of the Western Union company competed. The action was dismissed in the circuit court, and an appeal was taken by the Pensacola company to the supreme court of the United States, where the judgment was affirmed. (*Pensacola Tel. Co.* v. *Western Union Tel. Co.*, 96 U. S. 1.) The case was elaborately argued by counsel, and thoroughly consid-

ered by the court, — Mr. Justice Field delivering a very able and exhaustive dissenting opinion. The opinion of the court was delivered by Chief Justice Waite, and is to lengthy to be quoted here. It was decided, however (in brief), that the said act of July 24, 1866, "to aid in the construction of telegraph lines," etc., was a legitimate and proper exercise by Congress of the power "to regulate commerce with foreign nations and among the several states," and "to establish post-offices and post-roads"; that the powers given to and accepted by the Western Union Telegraph Company cannot be obstructed by state legislation; and that said act extends not only to such post-roads as are on the public domain, but to "any of the military or post roads of the United States which have been or may hereafter be declared such by act of Congress." The court say, among other things, as follows: "It is not necessary now to inquire whether Congress may assume the telegraph as part of the postal system, and exclude all others from its use. The present case is satisfied if we find that Congress has power, by appropriate legislation, to prevent the states from placing obstructions in the way of its usefulness." And the power of a state to tax its "franchise" to an unlimited extent would seem to be about as effective a means as could be imagined of "placing obstructions in the way of its usefulness."

But *Telegraph Co.* v. *Texas*, 105 U. S. 460, is still a more pointed case in favor of appellant's contention. In that case the legislature of Texas had passed a statute providing that every telegraph company doing business in the state should pay a certain tax for every message sent by it; and the Western Union Telegraph Company, appellant in the case at bar, having refused to pay taxes under said statute, — basing its defense on said act of Congress of July 24, 1866, — judgment had been recovered against it in the state court for the amount of such taxes. But on a writ of error the judgment was reversed. Here was a case almost impossible to be distinguished from *McCulloch* v. *Maryland*, 4 Wheat. 316. The court, in its opinion, deliv-

ered by Chief Justice Waite, among other things, say: "In *Pensacola Tel. Co.* v. *Western U. Tel. Co.*, 96 U. S. 1, this court held that the telegraph was an instrument of commerce, and that telegraph companies were subject to the regulating power of Congress in respect to their foreign and interstate business. A telegraph company occupies the same relation to commerce as a carrier of messages that a railroad company does as a carrier of goods. Both companies are instruments of commerce, and their business is commerce itself." The opinion then refers to rights held by the said telegraph company under the said act of Congress, by which it became a "government agent"; and then, referring to the said tax attempted to be levied on its messages by the state of Texas, says: "As such, so far as it operates on private messages sent out of the state, it is a regulation of foreign and interstate commerce, and beyond the power of the state. That is fully established by the cases already cited. As to the government messages, it is a tax on *the means employed* by the government of the United States to exercise its constitutional powers, and therefore void. It was *so decided* in *McCulloch* v. *Maryland,* 4 Wheat. 316, and has never been doubted since." And thus in that case the Western Union Telegraph Company is put in exactly the same class with the United States Bank in *McCulloch* v. *Maryland,* 4 Wheat. 316. With respect to the last-named case, we stated before that there was in principle no difference between a stamp tax on the notes of the United States Bank and a general tax upon its "franchise." But it is to be observed further on that subject, that the statute of Maryland imposing the stamp tax provided that the bank "may relieve itself from the operation of the provision aforesaid by paying annually, in advance, to the treasurer of the Western Shore, for the use of the state, the sum of fifteen thousand dollars. (See act on page 319, 4 Wheaton's Rep.) And so the bank might have avoided the purchase of stamped paper on which to issue its notes by simply paying a lump sum annually; and that would have been the paying of a tax upon its right to carry on

its operations, — upon its franchise. And if the court had seen any substantial difference between the two methods of accomplishing the same thing, it would have told the bank that it had no cause to complain of the *illegal* stamp tax, because that could have been avoided by the payment of the *legal* franchise tax. Suppose that the statute of Maryland had made no mention of a stamp tax, and had simply required the annual tax of fifteen thousand dollars, does any one suppose that in such event the great opinion of Chief Justice Marshall would never have been written, to become the broad and sure foundation for subsequent judicial decision in the realm of constitutional law ?

The only decision of the United States supreme court which can be invoked with any plausibility in favor of the validity of the tax here involved is to be found in the case of *Western Union Tel. Co.* v. *Massachusetts*, 125 U. S. 530. An analysis of the case, however, shows it to be entirely consistent with the decisions and views hereinbefore cited and expressed. In that case certain taxes levied against appellant herein, under certain statutes of the state of Massachusetts, were upheld; and it is true that in those statutes the words " corporate franchise " are used. But an examination of those statutes will show that the taxes there involved were levied upon the property of the company, and not upon its franchise; and the opinion delivered shows that such was the understanding of the court. When in a statute a certain thing is particularly described so as to clearly identify it, the character of the thing is not changed by a misnomer. The Massachusetts statutes with which the court was dealing may be found in full on pages 531 to 535 of 125 U. S. They contain in detail a long and somewhat complicated plan for the assessment and taxation of corporations. The general scheme is, that each corporation shall return annually to the tax commissioner the amount of its capital stock with its par and market value, and also a list of structures, works, machinery, real estate, etc.; railroad and telegraph companies shall

also return the whole length of their lines, and their length outside of the state; the commissioner is to ascertain from the returns or otherwise the true market value of the shares of the corporation, and to estimate therefrom the fair cash value of all of said shares constituting its capital stock; he is also to ascertain and determine the value and amount of all real estate, machinery, etc., owned by the corporation; then from the aggregate value of the shares of capital stock, ascertained as aforesaid, a great many deductions are to be made, and in case of railroad and telegraph companies having lines running beyond the state, there is to be deducted " such portion of the whole valuation of their capital stock, ascertained as aforesaid, as is proportioned to the length of that part of their line lying without the commonwealth," and also an amount equal to the value of certain property located within the state, and subject to local taxation; and the corporation is to pay a tax on such part of the value of the capital stock as remains after all the deductions are made. It thus appears that these statutes — of which the foregoing is a mere summary — undertake to provide a just and equitable mode by which the taxable property of a corporation shall be ascertained, according to business principles and usual methods of valuation and appraisement; and that mode is radically and entirely different from the unlimited irresponsible taxation of a " franchise," without regulation or condition, and without any necessary consideration of property values or recognized rules of assessment, such as we find in the case at bar. The tax under the Massachusetts statutes was a tax on *property*, and so the court clearly holds. Counsel for the telegraph company in that case argued that the tax was upon the franchise, and therefore void; and the court said upon that point as follows: " The argument is very much pressed that it is a tax upon the franchise of the company, which franchise, being derived from the United States by virtue of the statute above recited, cannot be taxed by a state, and counsel for appellant occasionally speak of the tax

authorized by the law of Massachusetts upon this as well as all other corporations doing business within its territory, whether organized under its laws or not, as a tax upon their franchises. But by whatever name it may be called, *as described in the laws of Massachusetts*, it is essentially an excise upon the capital of the corporation. The laws of that commonwealth attempt to ascertain the just amount which any corporation engaged in business within its limits shall pay as a contribution to the support of its government upon the *amount and value of the capital* so employed by it therein." The court further say that the rights conferred on the company by the said act of Congress do not exempt it from the " ordinary burdens of taxation," and that it is " liable upon its *real or personal property* as any other person would be "; and referring to *Telegraph Co.* v. *Texas*, 105 U. S. 460, it quotes the expression of Chief Justice Waite, that " its *property* in the state is subject to taxation the same as other property." Again the court say: "The tax in the present case, though nominally upon the shares of the capital stock of the company, is, in effect, a tax upon that organization on account of *property* owned and used by it in the state of Massachusetts." We think, therefore, that the decision is clearly to the point that the thing there sought to be taxed, " as described in the laws of Massachusetts," was not " franchise," but property in the ordinary sense, " by whatever name it may be called." Under this view, the case is entirely consistent with those of *California* v. *Railroad Companies*, 127 U. S. 1, and with the Pensacola case and the Texas case above cited; otherwise it is impossible to reconcile it with those cases. Moreover, in the Massachusetts case, the statutes provided that if the telegraph company failed to pay the taxes it should be enjoined from doing business, and the decree of the lower court had awarded an injunction; but the supreme court reversed that part of the decree, and held that the provision in the statutes for an injunction was, as against appellant, void, — thus, in effect, recognizing the rights of the appellant under the said act of Congress

as they had been declared in the other decisions hereinbefore cited. The case of *Massachusetts* v. *Western Union Tel. Co.*, 141 U. S. 40, also cited by respondent, is the same, practically, as the case in 125 U. S. which we have just been reviewing. It must be remembered that it has never been held in any of the cases that the *property* of a corporation holding national franchises was not subject to state taxation. In *McCulloch* v. *Maryland*, 4 Wheat. 316, the court say: " This opinion does not deprive the states of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank in common with the other real property within the state."

From the foregoing decisions and views, we are of opinion that the taxes sought to be recovered in this case were beyond the power of the state to levy, and therefore void.

The judgment is reversed, with direction to the superior court to dismiss the action.

SHARPSTEIN, J., PATERSON, J., HARRISON, J., GAROUTTE, J., and DE HAVEN, J., concurred.