[Crim. No. 429. Second Appellate District.—November 3, 1915.]

## THE PEOPLE, Respondent, v. IRENE E. MURPHY, Appellant.

CRIMINAL LAW—MURDER—EVIDENCE—DECLARATION OF DECEASED—RES GESTAE.—Upon the trial of a wife for the killing of her husband, where the case against her rests upon proof of incriminating circumstances, against which is her positive denial that she had fired the shot which produced the fatal injuries, it is reversible error to admit in evidence, upon the theory that it is properly a part of the *res gestae,* a statement made by the deceased about two minutes after the shooting that his wife had shot him, where such statement was made out of the presence of the wife to a third party, who, upon hearing the shot, had run a distance of from one hundred and fifty to one hundred and seventy-five yards to the scene of the homicide.

ID.—EVIDENCE—DETERMINATION OF RES GESTAE.—When competency is claimed for offered testimony of the acts, conduct, or words of a party to a transaction, expressed out of the presence of the other, on the ground that it is a part of the *res gestae,* it must appear that the transaction in which the parties were engaged had not ended; in other words, that the actors had not ceased in their performance of things, which made up the total of the occurrence.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Frank R. Willis, Judge.

The facts are stated in the opinion of the court.

Chauncey Gardner, and Edward C. Gilbert, for Appellant.

U. S. Webb, Attorney-General, and Robert M. Clarke, Deputy Attorney-General, for Respondent.

JAMES, J.—Defendant was charged with having, on the fifteenth day of April, 1915, murdered William Murphy. Upon her trial a verdict of manslaughter was returned by the jury and the court sentenced her to serve a term of two years' imprisonment in the state penitentiary. Motion for a new trial having been made and denied, an appeal was taken from that adverse order. An appeal was also taken from the judgment.

Deceased was the husband of appellant and at the time of the alleged homicide the two were living on a little ranch in the neighborhood of La Canada in the county of Los Angeles. Their habitation consisted of a tent, adjacent to which was a small wooden building. Fruit trees and grape vines were set about the place. Some time after, but near the noon hour, on April 15th, a neighbor named Lane, whose ranch adjoined that upon which the Murphys lived, heard the sound of a gun shot, which was followed by heavy groans, coming from the direction of the Murphy tent. He waited a moment and then started, as he testified, on a run in the direction from which the sound of the shot came. On his way he motioned to another neighbor at work in a vineyard to follow him. Lane testified that when he arrived at the Murphy place he found Murphy lying upon the ground in the driveway about thirty-five feet from the tent. His hat and pipe were on the ground a few feet away from his head, and he was groaning as though in great pain. Lane at that time saw no gun, but noticed a dead cat, which lay near Murphy's feet. A few moments later another neighbor arrived, and at this time Mrs. Murphy came from within the tent where the couple had been in the habit of sleeping. Murphy was carried into the tent and placed upon a bed, a physician was immediately summoned and the man died within the next hour and a half. Before his death his clothes were removed and it was found that a charge of gun shot, such as is ordinarily used for the killing of birds, had entered his body from the left and front and slightly above the hip. The charge of shot had passed, in part, first through the lower part of the left arm and then

on into the abdominal cavity, where it had cut the intestines and severed at least one large artery. Mrs. Murphy, the appellant, was in the tent at the time Lane arrived on the scene. After Murphy had been carried into the house, some of the neighbors asked her for hot water, and she said there was none, and when they requested her to have some heated she started to get up from the bed where she was sitting, but seemed unable to walk and she then said that she could not do what was requested of her. It was the claim of the prosecution that she was intoxicated at the time, and the evidence tended to show that such was her condition. The testimony further, in so far as her actions at that time were attempted to be described, was to the effect that she manifested no great grief over the condition of her husband, except that she once addressed an inquiry to the wounded man, calling him by his given name and asking him if he was going to leave her; also that she had lifted his head with her hands in a considerate way, indicating some concern upon her part as to the husband's condition. One witness testified that on the night preceding the alleged homicide he had met Murphy and the appellant in the city of Glendale, which appeared to be the place where the Murphys changed cars to go to their home. The witness testified that both Murphy and his wife appeared to be under the influence of liquor and that he, at their invitation, drank whiskey from a bottle which they had in their possession. A bottle containing whiskey and one containing wine were found in the tent after Murphy had been shot. This witness further testified that Murphy and his wife were quarreling and that Mrs. Murphy threatened her husband by saying that she would "fix him with a shot gun," or words to that effect. The testimony of the undertaker who went to remove the dead body of Murphy was to the effect that when he questioned appellant as to how the shooting occurred she said that she did not know; that her husband had gone out from the tent and that she had heard the shot and that Murphy immediately called to her, saying, "Irene, I am hurt"; that she had run out from the tent and found her husband lying on the ground; that she had tried to lift him up, but being unable to carry him, had returned to the tent to get a pillow with the purpose of placing it under his head, and that she was just about to return to him when the witness Lane arrived on the scene. She

told this undertaker, so the testimony was, that the gun was lying at the side of her husband when she found him, with his left hand either upon it or near it. Being later interrogated by attachés of the district attorney's office, she reiterated her statement that she did not know how her husband had been shot, but made a different statement regarding the location of the gun which she had previously stated she had picked up from beside her husband and taken to the tent at the time she returned for the pillow. The autopsy physician testified that there were no powder burns on the body. At the trial appellant, testifying in her own behalf, denied that she had shot her husband; denied that she made the threat testified to by the witness who claimed to have drunk liquor with the couple on the night of the 14th of April; she admitted having met this witness at the place he described, but stated that it was on April 12th and not April 14th. The substance of the testimony has now been stated, except that by which certain alleged statements made by Murphy after the shooting, are expressed, and it will be seen that, excluding such statements, the case against appellant rested upon proof of incriminating circumstances against which was her positive denial that she had fired the shot which produced the fatal injuries to the deceased.

It is claimed that evidence of a statement made by Murphy, the deceased, to the witness Lane as to who had fired the shot, was erroneously admitted, as appellant was not present at the time of the making of the statement; that it was therefore hearsay. Lane testified that from the time he heard the shot and the first groans until he arrived at Murphy's side about two minutes of time passed; that the place where he was before he started to run was at a distance of from 150 to 175 yards from the place where he found Murphy lying; that upon reaching Murphy's side he asked him where he was hurt; that Murphy indicated the portion of his body which had been wounded, by placing his hand there, and that then he (Lane) asked him how it happened, to which Murphy replied: "My wife shot me." This testimony was offered by the prosecution and received by the court upon the theory that it was properly a part of the *res gestae* and therefore not subject to the rule against the admission of hearsay testimony. It is admitted that this statement possessed none of the essentials of a "dying declaration."

From the narrative of the occurrence as it has been set forth in the foregoing, it will be noted that by the time Lane arrived at Murphy's side the occurrence which resulted in the shooting had entirely ended. If it may be said that the acts, conduct, or words of the parties to a transaction which are expressed within a time near to the principal occurrence are a part of the *res gestae*, then there was no error in the admitting of this testimony. There are some decisions, a number of them in jurisdictions outside the state of California, which affirm that the proximity in point of time of the occurrence to the happening of that claimed to be a part of the *res gestae* is an important consideration in determining questions like that here presented. Our own supreme court, in the case of *People* v. *Vernon*, 35 Cal. 49, [95 Am. Dec. 49], assumed the same ground in sustaining testimony there introduced. That decision, however, has been completely overruled by later cases in this state. These later cases are expressive of what seems to be the most reasonable, fair, and logical measure to apply to such evidence, and that is that when competency is claimed for offered testimony of the acts, conduct, or words of a party to a transaction, expressed out of the presence of the other, on the ground that it is a part of the *res gestae*, it must appear that the transaction in which the parties were engaged had not ended; in other words, that the actors had not ceased in their performance of things which made up the total of the occurrence. In the case of *Ah Lee*, 60 Cal. 85, the words of an English judge are quoted approvingly in argument. This judge, in defining the meaning of the term *res gestae* as applied to a criminal case, said: "Whatever act or series of acts constitute, or in point of time immediately accompany and terminate in the principal act charged as an offense against the accused, from its inception to its consummation or final completion, or its prevention or abandonment, whether on the part of the agent or wrongdoer in order to its performance, or on that of the patient or party wronged in order to its prevention, and whatever may be said by either of the parties during the continuance of the transaction, with reference to it, including herein what may be said by the suffering party, though in the absence of the accused during the continuance of the action of the latter, actual or constructive, e. g., in the case of flight or application for assistance, form part of the principal

transaction, and may be given in evidence as part of the *res gestae* or particulars of it; while, on the other hand, statements made by the complaining party, after all action on the part of the wrongdoer, actual or constructive, has ceased, through the completion of the principal act or other determination of it by its prevention, or its abandonment by the wrongdoer, such as, e. g., statements made with a view to the apprehension of the offender, do not form part of the *res gestae*, and should be excluded." This measure was applied again in the case of *People* v. *Wong Ark*, 96 Cal. 125, [30 Pac. 1115]. That case presents facts which are very similar to those illustrated by the evidence here. At that trial a police officer was permitted to testify that after the shooting he returned to the place where the deceased was lying, a distance of about one hundred and forty yards, and had a conversation with her in which the deceased declared that the defendant was the man who had shot her. The court held that the testimony was improperly admitted and a new trial was allowed for that reason. By all of the evidence in this case it seems very clear that at the time Lane arrived at the place where Murphy was lying, all acts of the assailant, if any such there was, had ceased. The shooting had taken place and Murphy was lying on the ground—had evidently remained there for a period of not less than two minutes before he was approached by Lane, and made the statement that his wife had shot him. That this assertion as given in testimony to the jury, in view of the circumstantial state of the evidence against the accused, was vitally damaging can admit of no doubt. And to emphasize the gravity of the error, reference may be made to the testimony of one of the witnesses, a neighbor of the Murphys and who had known the deceased for several years. He testified that while Murphy was lying upon the bed after they had carried him into the tent, he (the witness) said to him: "Bill, how did this happen?" This testimony was objected to by the prosecution, but was admitted by the court, the witness testifying that Murphy had replied: "I stepped on it." It would have been quite natural and no doubt was the fact that the jury gave great weight to the accusation first made by the deceased against his wife in considering the other evidence which presented circumstances more or less incriminating. To

our minds, the error was not only prejudicial, but such a one as may be said to have produced a miscarriage of justice at this trial, within the meaning of the constitutional provision.

The judgment and order are reversed.

Conrey, P. J., and Shaw, J., concurred.