[Civ. No. 6149. Third Appellate District.—September 11, 1939.]

MINNIE WEIAND, as Administratrix, etc., Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

502

W. D. Tillotson and George R. Freeman for Appellant.

M. Mitchell Bourquin, Carter, Barrett, Finley & Carlton and P. J. Murphy for Respondent.

TUTTLE, J.—This action is brought by the widow of Edward W. Weiand to recover damages for the death of the latter, and is based upon the Federal Employers' Liability Act. The jury awarded damages in the sum of $30,000 and the appeal is from the judgment.

Edward W. Weiand, at the time of his death on the 20th day of January, 1937, was forty-nine years of age, and had been engaged in railroading for some twenty-five years, about fourteen years with the defendant. On the 20th of January, 1937, Weiand was the fifth brakeman on an extra freight train comprising approximately one hundred six cars running from Gerber, in Tehama County, to Roseville, in Placer County. As fifth man, Weiand was responsible for the second twenty-five or thirty cars behind the engine, the first twenty-five or thirty cars being under the charge of the head brakeman, Paul Fizer. The train arrived in the Roseville yard in daylight at approximately 7:30 o'clock in

the morning. It was a very cold morning, and many of the cars were covered with ice, snow and frost. The principal part of the defendant's yard at Roseville, California, lies west of the Lincoln Street crossing. The railroad tracks run in a general westerly and easterly direction. The train in question came into the Roseville yard from the north on a track commonly known as the Oregon lead. Just before this track reaches the defendant's depot or station, which is a short distance east of Lincoln Street, it turns in a general westerly direction and crosses Lincoln Street at right angles. The Oregon lead retains its identity until it reaches switch No. 2, which is 320 feet west of the west line of Lincoln Street. From this point, continuing west, the lead track is known as track No. 1. Track No. 2 branches off of the lead on the north at switch No. 2. The defendant's westbound main line is south of the lead. A yard crew working in the west end of the yard had "kicked" two cabooses down the lead and into track 1 some twenty minutes before the train entered. These cabooses stood then about fifty feet from the frog over which trains would pass turning into track 2. Except for the cabooses, track 1 was unoccupied at that end of the yard. As the train turned over the frog into track 2, Weiand was caught between the caboose and the side of the car of the train upon which he was riding. He was found lying on the ground between the caboose and the moving train upon which he had been employed, in an unconscious condition. He lay with his head to the west in the direction of the travel of the train. His clothing was split, exposing the skin up and down the back from waist to shoulder. His sixth, seventh, eighth, ninth, tenth, eleventh and twelfth ribs were broken off an inch from the spine and had pierced the lung and spleen. His chest was crushed, and the whole chest wall was badly discolored. There were a number of lacerations distributed over the body. The left side of the skull was also fractured. He died within a short time. There was no eye-witness to the occurrence. When last seen he was standing on top of one of the moving cars of his train, just before his body was discovered, and while the train was entering the railroad yard at Roseville.

The chief contention urged by appellant as a ground for reversal is that "there is no evidence that the negligence of the defendant, if any, was the proximate cause of the

accident''. It relies upon the following familiar rule laid down in *Wheelock* v. *Freiwald*, 66 Fed. (2d) 694-698:

"A verdict cannot be permitted to stand, which rests upon conjecture, surmise or speculation, but plaintiff must produce substantial affirmative proof that the negligence of the carrier caused the injury, and 'where proven facts give equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover.'' (*Pennsylvania R. Co.* v. *Chamberlain*, 288 U. S. 333 [53 Sup. Ct. 391, 77 L. Ed. 819].)''

Seeking to invoke the foregoing rule in the instant case, appellant states:

"The most logical cause of the accident and the only theory which coincides with the undisputed and uncontradicted evidence is that Weiand came to his death by reason of his own voluntary act in attempting to walk upon the top of a car, made slippery by ice and frozen snow, while it was in motion, and that he slipped and went off of the car feet first.''

The law is settled that in an action brought under the provisions of the Federal Employers' Liability Act, the rights of the plaintiff and the obligations of the defendant depend upon the act and the applicable principles of common law as interpreted by the federal courts, and not by the decisions of courts of the several states when in conflict therewith. We cannot see any material difference between the rule in the Wheelock case, quoted above, and the rule prevailing in this state to the effect that there must be substantial proof of negligence in any case to authorize a recovery. The above rule is predicated upon the theory that *neither* of two inconsistent inferences has been established. Obviously, if plaintiff has failed to make out a case for the jury on either of two theories, no recovery can be had. If, however, plaintiff has proven sufficient facts to justify a verdict upon *one* theory, the fact that there may be one or more other seemingly rational explanations of the episode in no manner precludes a recovery or invalidates the verdict. These are mere matters of argument to be presented to the jury.

The first inquiry is: Was any negligence upon the part of defendant proven? It is contended by respondent that such negligence consisted in leaving the two cabooses at a point where the converging tracks were so close that there was insufficient "clearance" between the cabooses and passing freight cars, and particularly between the body of an employee who was in the act of descending from the top of a freight car by means of a "ladder" affixed to the side of said car, or who was on such ladder in the discharge of any other of his duties. The evidence shows that the distance between the corner of the easterly caboose and the ladder of a car of the same type upon which deceased was riding, is 16½ inches. There is the further fact proven that the sway of the car incidental to passing over the switch might reduce this clearance some seven inches more. Sometimes, according to witness Wait, this swaying motion continues clear through the yard. The testimony of witness Keller shows that the cabooses stood on track No. 1, at a point about fifty feet west of the *frog* of the switch over which the train passed in moving on track No. 2. These two tracks merged at the switch. Witness Keller saw the body of Weiand immediately after the accident, and the relative positions of the passing cars in the train on which deceased was riding, and the two cabooses. Keller had been engaged for years in railroad work. He had worked in 1936 and 1937 for the defendant at Roseville as car inspector, and as general car foreman in Oakland during 1929. His duties were to inspect trains as they were coming in or leaving the terminal at Roseville, and he was so engaged on the day that Weiand was killed. He testified that there was not sufficient "clearance" between the east end of the caboose and the train on which Weiand was working. He testified that "clearance is known as a safe distance from one car to another where it is safe in case a man on the ladder of a moving car, that he is safe, that he will not be struck by the car next to him." If there was insufficient "clearance" between the passing train and the cabooses, or one of them, the jury was justified in finding that the act of the company in leaving the cabooses too near the switch and consequently too close to the other track, was negligence. This fact was one for the jury to determine, and we are satisfied that there is sufficient evidence to sustain such a finding.

■ The question then arises, as to whether or not such negligence was the proximate cause of the injury. We believe that the facts and circumstances shown by the record were sufficient to justify a finding in favor of respondent upon that issue, and to remove the verdict from the implication that it was the result of speculation and conjecture and without any factual foundation whatever. The testimony relating to the injuries received by Weiand (detailed *supra*), would support the inference that they were not the result of a "fall", but the result of a crushing received between the caboose and the moving car. At a point almost directly over the spot where the body was found, there were marks upon the side of the caboose which ran more parallel to the roof than in a vertical direction. The paint on the caboose was scuffed up and scratched westward. There were no marks whatever upon the *roof* of the caboose, though it is several inches lower than that portion of the roof of the car which was nearest to the caboose. The clothing of deceased was split open the entire distance up and down the back, just left of the spine. There was paint upon the shoes of deceased of the same color as that of the caboose. These and other facts disclosed by the record are ample to support a finding that while deceased was upon the side ladder of the car upon which he was riding, he was brushed off and crushed by the easterly caboose which had, through the negligence of defendant, been allowed to stand at a point on the track where there was insufficient "clearance", as that term is defined by the witness Keller. The opinion of Judge Rudkin, in the case of *Hobbs, Wall & Co.* v. *Petterson,* 2 Fed. (2d) 594, (C. C. A.) answers the contention of appellant on this phase of the case:

"But the court was not compelled to accept any of the theories advanced by the plaintiff in error. The mere suggestion of such theories did not necessarily throw the case into the realm of speculation and compel a finding in its favor. As said by the court in *Wabash Screen Door Co.* v. *Black,* 126 Fed. 721, 725 [61 C. C. A. 639, 643] : 'While the evidence was circumstantial, it was ample in our opinion, to warrant the submission of the question to the jury under the instructions given. . . . Doubtless a jury ought not to be permitted to speculate, in the sense of guess, between causes, when no reasonable explanation of the injury can be found in the testimony. . . . But, *in the absence of direct*

*testimony, the simple suggestion of theories by the defense does not reduce the jury to mere speculation, and disqualify it from determining the cause of the injury complained of.* The theories suggested may be forced and fanciful, finding no reasonable foundation in the facts proved. They may be explanations which do not explain; which the common sense of the jury, when applied to the testimony, would instantly reject.' " (Italics ours.)

The same holding is found in the case of *Kulp* v. *Chicago, St. Paul, Minn. & Omaha Ry. Co.*, 88 Fed. (2d) 466, (C. C. A.) where numerous authorities are cited in support thereof.

 It is next urged that "there is no evidence that at the time of the accident said Edward W. Weiand was acting within the scope of his employment with the defendant". It is not contended that deceased was at a place where he *at no time* was not within the scope of his employment. The record is undisputed that a brakeman is called upon at *certain* times and in *certain* contingencies to ascend and descend the side ladder of a freight car. In this respect the case differs from many of the cases relied upon by appellant. The question is not whether deceased was doing an act which was *altogether* outside the scope of his employment but whether or not, upon this *particular occasion,* he was called upon to use the ladder. That it was the custom of a brakeman to act in the same manner as decedent in the discharge of his duties, was established by the evidence of witness Keller, who testified: "It was a common thing, as the train came in, to see a brakeman on top of the train and somewheres near Lincoln street, why, to see them climb out and drop off of the train." Witnesses of both appellant and respondent testified that brakemen were required to descend and get off as the train entered the receiving track, and from the ground to inspect the running gear of their train. It is the contention of appellant, however, that this duty arose when the train came to a stop just before entering the railroad yards at Roseville. The evidence shows that the train did stop, but only momentarily—"for a few seconds", according to the engineer. It is during such an interval that appellant insists the duty arises, in respect to a brakeman, to inspect the running gear. Weiand was injured after the train had again started up, and after it had switched to the receiving track. There is testimony that the duties of the deceased would require him to descend

from the car at a point after the train had entered the receiving track. The following is a question put to, and answer of witness Mauzy: ''What is the custom and practice, Mr. Mauzy, of brakemen riding on trains entering yards?'' ''Well, they are supposed to be out until they start in on the receiving track, or *down part way on the receiving track,* and I get off and watch my portion of the train.'' Witness Wait testified that men are expected to get out on the side of a train coming into the yards. In our opinion the evidence would support a finding to the effect that Weiand, in attempting to descend from the car where he did, was following a custom which prevailed in defendant's yard at Roseville, in respect to his duties, and that the case comes directly within the rule laid down in *Texas & P. R. Co.* v. *Harvey,* 228 U. S. 319 [33 Sup. Ct. 518, 57 L. Ed. 852–857], where it is said:

''The other errors assigned concern the requests of the defendant below for a peremptory instruction in its favor because Harvey had placed himself in the window where none of his duties required him to be; but the record discloses that it was customary for a hostler's helper to get upon an engine and to look out of the cab window for the reasons we have stated, and for one helper to lend aid to another. We do not think that the testimony shows that Harvey was not in the line of his duties when he got upon the engine. . . . ''

Furthermore, the record shows without contradiction that there were a number of instances and contingencies which required a brakeman, in the line of his duties, to descend the ladder on the side of a car. It was a matter for the jury to decide, whether or not, upon the occasion here involved, Weiand acted within the scope of his employment. We are satisfied that the record justifies such a finding. We cannot accept the narrow and limited view taken by appellant, and believe that to do so would stultify a just and reasonable application of the rules of the law governing the relationship between employer and employee.

It is urged as another ground for reversal that the deceased assumed the risk of any injury under the circumstances. The rule applicable to such a defense is thus stated in *Chicago, R. I. & Pac. Ry. Co.* v. *Ward,* 252 U. S. 18 [40 Sup. Ct. 275, 64 L. Ed. 430]:

"As to the nature of the risk assumed by an employee in actions brought under the Employers' Liability Act, we took occasion to say in *Chesapeake & O. R. Co.* v. *De Atley,* 241 U. S. 310, at page 315 [36 Sup. Ct. 564, 60 L. Ed. 1016-1020]. 'According to our decisions, the *settled rule is not that it is the duty of an employee to exercise care to discover extraordinary dangers that may arise from the negligence of the employer* or of those for whose conduct the employer is responsible, but that the employee *may assume that the employer or his agents have exercised proper care* with respect to his safety *until notified to the contrary,* unless the want of care and the danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them.' . . . " (Italics ours.)

The question here is whether or not the lack of sufficient clearance between the caboose and the train was "so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them". This was a question of fact for the jury. Several witnesses testified that it would be difficult or impossible for a man looking at the caboose from the east (and, by inference, from a position on the train similar to that occupied by the deceased when he was approaching the caboose), to tell whether or not there was sufficient "clearance", as we have described that term. The evidence is sufficient to justify a finding that the negligence of the defendant, in leaving the cabooses where they stood, presented a danger which was not obvious, and which, with the exercise of ordinary prudence, could not have been anticipated. **[6]** Deceased was under no duty to exercise care to discover dangers not ordinarily incident to the employment, but which resulted from the employer's negligence. (39 C. J., p. 692, sec. 896; 16 Cal. Jur., p. 1068, sec. 47.)

It is contended that the damages are excessive, in that they appear to have been given under the influence of passion and prejudice. We find nothing in the record to warrant this assertion. The decedent left a surviving wife. During the past six months before his death his earnings averaged $216 per month. He was forty-nine years of age, and his expectancy was 21.81 years. During the times that he was employed in railroad work his earnings were about $200 per month. It is true that at times he was not en-

gaged in his regular work, and during such times he may have received less compensation. His ability to earn, rather than the amount actually earned, may be considered by the jury in arriving at the amount of damages to be awarded his widow. (*Hosman* v. *Southern Pac. Co.*, 28 Cal. App. (2d) 621-634 [83 Pac. (2d) 88].) The record is not vulnerable to this attack.

■ Finally, and in connection with the claim of excessive damages, it is urged that decedent was guilty of contributory negligence, and that the verdict should be reduced proportionately, under the provisions of the act mentioned above (U. S. Code, title Railroads, sec. 53). After reviewing the evidence, we cannot say, as a matter of law, that decedent was guilty of contributory negligence. The determination of this question of fact was a function committed solely by law to the jury. There is no merit in this point.

The judgment is affirmed.

Pullen, P. J., and Thompson, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 9, 1939. Carter, J., did not participate.