Filed 6/4/14  PCB Productions v. MJC America CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PCB PRODUCTIONS, INC., | B242443 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. LC090187) |
| MJC AMERICA, LTD., et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment and orders of the Superior Court of Los Angeles County, James A. Kaddo, Judge.  Affirmed in part and reversed in part.

Reed Smith, Margaret M. Grignon, Anne M. Grignon; Cohon & Pollak, Jeffrey M. Cohon, Howard A. Pollak and Henry Nicholls for Plaintiff and Appellant.

Horvitz & Levy, Lisa Perrochet, Robert H. Wright; Yoka & Smith, Christopher E. Faenza and Christopher P. Leyel for Defendants and Appellants.

Plaintiff and appellant PCB Productions, Inc. (PCB) sustained damages from a fire in its sound studio. After determining that the fire was caused by a small table fan that had overheated and ignited, PCB sued the fan's manufacturer (defendant and respondent MJC America, Ltd. [MJC]) and retailer (defendant and respondent Fry's Electronics, Inc. [Fry's]) for breach of warranty and strict product liability. The jury found defendants liable under both theories and awarded PCB $6.2 million in damages, including almost $5.5 million for the cost of recreating its lost original compositions and sound samples.

During posttrial proceedings, the trial court granted defendants' motion for new trial on the ground the evidence was insufficient to support the verdict. The trial court's reasons for concluding the jury should have reached a different verdict were that: (1) PCB failed to prove that the fire was caused by a design or manufacturing defect in the fan; (2) the jury mistakenly applied the consumer expectation test rather than the risk-benefit test; and (3) the jury applied the wrong measure of damages. After granting the motion for new trial, the trial court denied the motion for judgment notwithstanding the verdict (JNOV) as moot.

PCB appealed from the new trial order; defendants filed a protective cross-appeal from both the judgment and the order denying the motion for JNOV. For the reasons discussed below, the new trial order is reversed, the judgment is reinstated and affirmed, and the order denying the motion for JNOV is affirmed.

**BACKGROUND**

PCB produces digital soundtracks and audio for motion pictures, television, video games, and other media. PCB's credits include the *Call of Duty* series of video games, *Transformers*, *Lord of the Rings*, the *Spiderman* series, the *X-Men* series, and the *Guitar Hero* video game series.

PCB's two sound studios, Studio A and Studio B, are located in a separate wing of PCB president Keith Arem's home. Studio B, where the fire occurred, was built with thick concrete walls, steel doors, fire retardant materials, insulated vents, sound traps, and

2

special filters to remove dust from the room. Studio B also had a special air conditioning system that was designed to keep cool air flowing onto the computers.

The computers and other essential studio equipment were kept in a cabinet or console near a wall. Arem noticed that the air behind the computers was not circulating and decided to purchase a fan that could be placed behind the cabinet.

In June 2008, Arem went to a Fry's store and told the salesperson that he was looking for a fan that could be used on a continuous basis to circulate the air behind the computer console in the sound studio. The salesperson told Arem that the table fan manufactured by MJC had a "thermostat or a way to shut itself off so it wouldn't overheat." The salesperson also told Arem that the fan's "safety motor" would turn the fan off "if it ever got too hot" or if the blades became obstructed. Based on the salesperson's representations regarding the fan's safety features, Arem purchased the fan made by MJC.

Arem placed the fan on the floor behind the computer console and plugged it into an electrical outlet on a separate circuit from the recording equipment. Arem, who is a self-described "neat freak," testified that he regularly maintained the area behind the computer console.

PCB used the fan on a nonstop basis for about three or four months until the fire occurred sometime during the weekend of October 25, 2008. No one was present when the fire broke out. Arem and his family were away on vacation and the studio was closed for a four-day weekend. Pursuant to PCB's standard practices, the PCB employee (Matthew Lemberger) who closed the studio on the Wednesday before the fire testified that he turned off all of the equipment in the room except the fan.

The fire damaged all of the equipment in Studio B, including the fan, large mixing consoles, analog audio compressors, keyboard samplers, synthesizers, sound processors, computers, hot swap drawers, and more than 15 backup devices. The fire also destroyed the only copies of PCB's original compositions and sound samples.

On July 15, 2010, PCB sued MJC and Fry's for breach of warranty and strict product liability, claiming the fan was defective because, contrary to the ordinary

3

consumer's expectations, the fan overheated and caught on fire. PCB alleged that defendants had: (1) breached express and/or implied warranties that the fan was safe; and (2) provided a fan that was defective under the consumer expectation test because it failed to perform as safely as an ordinary consumer would have expected it to perform. PCB sought compensation for property damage, lost profits, lost original compositions, and lost original sound samples.

## I. Causation

As to causation, the issue was whether the fan caused the fire, or whether the fire started elsewhere and spread to the fan. It was undisputed that the area with the greatest fire damage—and therefore, the area where the fire most likely began—was the area behind the computer console where the fan was located.

Douglas Bennett, an electrical engineer, testified as PCB's causation expert. Bennett testified that based on his examination of the electrical equipment that was damaged in the fire, the only evidence of arcing (i.e., beading or globules of melted copper that survived the fire) was on the service cord *inside* the fan's motor housing. This evidence led Bennett to conclude that the fan's motor overheated and started a fire inside the fan's motor housing. As the fire melted the insulation on the fan's service cord, the copper conductors came into contact and created arcing inside the motor housing. By the time the fire spread along the service cord outside the motor housing, the circuit breaker had interrupted the flow of electricity, which precluded further arcing elsewhere along the cord. Bennett testified that because the motor overheated and started a fire, the fan was "unsafe" and "defective."

Mack Quan, a mechanical engineer, testified as defendants' causation expert. Quan testified that he could not tell by looking at the fan's damaged service cord (which had been removed from the damaged motor housing) whether arcing had occurred on the portion of the cord that was inside or outside the motor housing. According to Quan: "There was no way to discern whether that damage, this beading, occurred on the outside

4

or the inside because the length of the cord that goes inside the fan varies to some degree[.]"

Quan testified that because the fire could have been caused by something unrelated to a defect in the fan—such as a damaged cord, dust or debris in the fan, or a bad connection at the outlet—he could not identify the cause of the fire. In Quan's opinion, the discovery of beading on the fan's service cord did not rule out the possibility that arcing had occurred elsewhere in the room.

## II.      Design Defect

Before trial, PCB submitted a jury instruction on the consumer expectation test for establishing a design defect. CACI No. 1203, as given to the jury, stated: "PCB Productions, Inc. claims the fan's design was defective because the fan did not perform as safely as an ordinary consumer would have expected it to perform. To establish this claim, PCB Productions, Inc. must prove all of the following: [¶] 1. That Defendants manufactured and sold the fan; [¶] 2. That the fan did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way; [¶] 3. That PCB Productions, Inc. was harmed; and [¶] 4. That the fan's failure to perform safely was a substantial factor in causing PCB Productions, Inc.'s harm."

Consistent with PCB's reliance on the consumer expectation test, which generally does not permit expert testimony on the issue of ordinary consumer expectations (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 563 (*Soule*)), Bennett provided no expert testimony on the fan's design or safety features and whether those features were adequate. Bennett testified that because he was not asked to analyze the fan's design, he did not perform a design analysis and had no opinion regarding the adequacy of the fan's design.

5

Because PCB was relying solely on the consumer expectation test, it elected not to request a risk-benefit instruction for establishing a design defect (CACI No. 1204).[1] Based on Bennett's expert testimony that the fire was caused when the fan overheated and ignited, PCB's theory was that the existence of a design defect could be reasonably inferred under the consumer expectation test because, under the circumstances, no ordinary consumer would have expected the fan to overheat and catch on fire.

During trial, defendants moved to exclude CACI No. 1203, the consumer expectation test instruction. Defendants' theory was that under the circumstances, the issue of design defect cannot fairly be resolved by referring to the expectations of an ordinary consumer.

PCB opposed the motion to exclude CACI No. 1203, which the court took under submission.

Consistent with its view that the consumer expectation test was not applicable to this case, defendants presented Quan's expert testimony regarding the merits of the fan's design. Quan testified that the fan was properly designed according to industry standards

---

[1]     CACI No. 1204, "Strict Liability—Design Defect—Risk-Benefit Test—Essential Factual Elements—Shifting Burden of Proof," provides:

"[*Name of plaintiff*] claims that the [*product*]'s design caused harm to [*name of plaintiff*]. To establish this claim, [*name of plaintiff*] must prove all of the following:

"1.  That [*name of defendant*] [manufactured/distributed/sold] the [*product*];

"2.  That [*name of plaintiff*] was harmed; and

"3.  That the [*product*]'s design was a substantial factor in causing harm to [*name of plaintiff*].

"If [*name of plaintiff*] has proved these three facts, then your decision on this claim must be for [*name of plaintiff*] unless [*name of defendant*] proves that the benefits of the [*product*]'s design outweigh the risks of the design. In deciding whether the benefits outweigh the risks, you should consider the following:

"(a)  The gravity of the potential harm resulting from the use of the [*product*];

"(b)  The likelihood that this harm would occur;

"(c)  The feasibility of an alternative safer design at the time of manufacture;

"(d)  The cost of an alternative design; [and]

"(e)  The disadvantages of an alternative design; [and]

"[(f)  [*Other relevant factor(s)*].]"

6

because of its heat protection system known as impedance protection.[2]  Quan explained that because industry standards require small motor fans of this type to have only one form of heat protection, no additional system (such as a thermal fuse or reset switch) was necessary in this case.  Quan testified that during testing of a similar fan, he was able to run the fan on a continuous basis for five months without mishap.

After both parties rested, the trial court overruled defendants' objection to the CACI No. 1203 instruction on the consumer expectation test, which was the only design defect instruction given to the jury.  Because the jury was not given the CACI No. 1204 instruction on the risk-benefit test, it was not asked to choose between the consumer expectation and risk-benefit tests.

### III.    Breach of Warranty

In support of its breach of warranty claim, PCB relied on Arem's testimony regarding the salesperson's assurances that the fan had a thermostat or safety motor that would turn the fan off before it overheated or if its blades became obstructed.  PCB also relied on the wording on the box in which the fan was sold.  The word "safe" appeared numerous times on the box, which referred to the fan's "[p]owerful yet safe" "smart safety motor."  In addition, PCB relied on the owner's manual, which also touted the fan's safety.  Although the manual warned that a fire could occur if the fan was not used in accordance with the manual, it did not warn against running the fan on a continuous basis.

---

[2]    Quan testified that impedance protection works by increasing the resistance of the fan's electrical wires as the temperature increases.  The increased resistance limits the amount of electrical current that runs through the wires, thus preventing the motor from overheating.

The jury was given instructions on express warranty (CACI No. 1230) [3] and implied warranty of merchantability (CACI No. 1231).[4]

## IV.  Damages

PCB requested damages of more than $11 million, consisting of:  (1) $562,584.67 for property damage (which was stipulated to by the parties); (2) $590,566 for lost

---

[3]    CACI No. 1230, "Express Warranty—Essential Factual Elements," as given to the jury, provided:

"PCB Productions, Inc. claims that it was harmed by the fan because defendants represented, either by words or actions, that the fan was safe but the fan was not as represented.  To establish this claim, PCB Productions, Inc. must prove all of the following:

"1.  That defendants made a statement of fact received by PCB Productions, Inc. that the fan was safe;

"2.  That the fan did not perform as stated;

"3.  That PCB Productions, Inc. took reasonable steps to notify defendants within a reasonable time that the fan was not as represented, whether or not defendants received such notice;

"4.  That PCB Productions, Inc. was harmed; and

"5.  That the failure of the fan to be as represented was a substantial factor in causing PCB Productions, Inc.'s harm."

[4]    CACI No. 1231, "Implied Warranty of Merchantability—Essential Factual Elements," as given to the jury, provided:

"PCB Productions, Inc. also claims that it was harmed by the fan that it bought from defendants because the fan did not have the quality that a buyer would expect.  To establish this claim, PCB Productions, Inc. must prove all of the following:

"1.  That PCB Productions, Inc. bought the fan from defendants;

"2.  That, at the time of purchase, defendants were in the business of selling these goods;

"3.  That the fan was not fit for the ordinary purposes for which such goods are used;

"4.  That PCB Productions, Inc. took reasonable steps to notify defendants within a reasonable time that the fan did not have the expected quality;

"5.  That PCB Productions, Inc. was harmed; and

"6.  That the failure of the fan to have the expected quality was a substantial factor in causing PCB Productions, Inc.'s harm."

profits; (3) $3,895,000 for the cost of recreating the lost original compositions; and $6,299,000 for the cost of recreating the lost original sound samples.

### A.     Original Compositions

According to Arem's testimony, all of the multitracks of PCB's original compositions were destroyed in the fire. The multitracks were valuable to PCB because they were used to produce new works. It would take several years for PCB to "recreate that music and then re-release it."

According to PCB's music industry expert, David Fisher, it is possible to determine the fair market value of registered compositions based on past royalty earnings. However, only a few of PCB's lost original compositions were registered. Fisher explained that it would be difficult to determine the fair market value of PCB's unregistered compositions, because "you can't price a song."

### B.     Sound Samples

According to Arem's testimony, all of PCB's original sound samples, which were created over a 25-year period, were also destroyed in the fire. Arem testified that PCB's lost sound samples were unlike the generic sounds that can be purchased on the internet. Arem testified that he "frequently" traveled to various locations in order to record different sounds. For example, Arem went to Bali and "hired an entire temple full of performers to do the Kecak Monkey dance." He directed, recorded, and developed those samples into the individual sound samples that he later used in film scores. He explained that although people would say, "Oh, there's a Kecak Monkey Dance that we recorded on a sound library," those sounds "would be different than ours, the way that I would record the sounds, the way that I would direct the sounds, the way I would process the sounds." He testified that even if he could purchase a commercial sound library, it would not contain the same sounds and would not "sound at all the way that we would want our sounds to sound."

C.    *Jury Instructions*

Based on the unique nature of PCB's lost original compositions and sound samples, PCB requested that the jury be given Special Instruction No. 1 on the replacement cost measure of damages. Special Instruction No. 1, titled "Loss or Destruction of Personal Property Where Its Market Value is Uncertain," stated: "Although the general rule is that the measure of damage for the loss or destruction of personal property is the value of the property at the time of such loss or destruction, where that value is uncertain, the plaintiff may establish the value of the personal property with evidence of replacement cost of the personal property, including the cost to produce the personal property, the amount of time expended in producing the personal property."

Defendants submitted a fair market value instruction (CACI No. 3903K), titled "Loss or Destruction of Personal Property (Economic Damage)," which stated: "To recover damages for the destruction [of PCB Productions, Inc.'s Music Library,] PCB Productions, Inc. must prove the fair market value of the Music Library just before the harm occurred. [¶] 'Fair market value' is the highest price that a willing buyer would have paid to a willing seller, assuming: [¶] 1. That there is no pressure on either one to buy or sell; and [¶] 2. That the buyer and seller are fully informed of the condition and quality of the Music Library."

During trial, defendants moved to exclude PCB's Special Instruction No. 1. PCB opposed the motion, which the court took under submission. After the parties rested, the court overruled defendants' objection. The court instructed the jury on both the fair market value (CACI No. 3903K) and replacement cost (Special Instruction No. 1) measure of damages. Accordingly, the jury was allowed to decide which measure of damages—replacement cost or fair market value—was applicable to the lost original compositions and sound samples.

10

## V.     Jury Verdict

After less than a day of deliberations, the jury returned a special verdict in which it awarded more than $6.2 million in damages to PCB.[5]  In its responses to the special verdict questions, which are set forth below, the jury voted nine to three on questions 1 through 4 and 6, and voted twelve to zero on questions 5 and 8.  The jury did not answer question 7, which was inapplicable in light of its other responses.

"1.     Did MJC America, LTD. and/or Fry's Electronics, Inc. manufacture and distribute a fan which was defective because it failed to perform as safely as an ordinary customer would have expected?

"  X   Yes          _____ No

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"2.     Was MJC America, LTD. and/or Fry's Electronics, Inc.'s manufacture and distribution of a fan which was defective because it failed to perform as safely as an ordinary customer would have expected, a substantial factor in causing harm to PCB[] Production[s], Inc?

"  X   Yes          _____ No

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"3.     Did MJC America, LTD. and/or Fry's Electronics, Inc. breach a warranty to PCB Productions, Inc.?

"  X   Yes          _____ No

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[5]     On March 21, 2012, the matter was submitted to the jury, which deliberated from 3:12 p.m. to 4:20 p.m. that day.  On March 22, 2012, the jury resumed its deliberations at 9:30 a.m.  After a noon recess, the jury returned its verdict at 1:44 p.m. that day.

"4.     Was MJC America, LTD. and/or Fry's Electronics, Inc.'s breach of a warranty to PCB Productions, Inc., a substantial factor in causing harm to PCB[] Production[s], Inc.?

"   X   Yes          _____ No

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"5.     What are PCB Productions, Inc.'s damages?  Do not reduce the damages based on the fault, if any, of PCB Productions, Inc.

"Property Damage:              $  562,584.67       (This amount has already been
                                                   agreed to by the parties)

"Lost profit:                  $  200,389.80

"Lost original compositions:   $  210,000

"Lost sound samples:           $5,250,000

"TOTAL                         $6,222,974.47

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"6.     Did PCB Productions, Inc. misuse the fan in a way that was so highly extraordinary that it was not reasonably foreseeable to MJC America, LTD. and/or Fry's Electronics, Inc.?

"_____ Yes              X   No

"If your answer to question 6 is yes, then answer question 7.  If you answered no, insert the number zero next to PCB Production[s], Inc.'s name in question 8.

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"8.    What percentage of responsibility for PCB Production[s], Inc.'s harm do you assign to:

"MJC America, LTD. or Fry's Electronics:    _____%

"PCB Productions, Inc.[:]                               0      %

"TOTAL                                     100%"

## VI.    Defendants' Motions for New Trial and JNOV

Defendants filed posttrial motions for new trial and JNOV based on erroneous instructions and excessive damages.

### A.    *Defendants Argued That the Consumer Expectation Test Instruction Was Inapplicable as a Matter of Law*

In their motion for new trial, defendants contended the consumer expectation test instruction was inapplicable as a matter of law because, given the inability of PCB's expert to identify a defect in the fan that caused the fire, the ordinary consumer would lack sufficient knowledge to form any expectations regarding the minimum safety features of a fan.  Defendants argued:  "The issue before the court is straightforward:  ***If plaintiff's own electrical engineering expert cannot describe what defect in the fan caused the fire, how can a lay juror be expected to make such a determination?*** Because the ordinary consumer would not have sufficient knowledge to form expectations of a safe design for the fan to be used as plaintiff used it here, the court's use of the consumer expectation test was an error in law."  Defendants argued that the erroneous instruction was prejudicial because, in light of the nine-to-three liability vote, the jury was likely to have reached a different result under the risk-benefit test.

In their motion for JNOV, defendants similarly argued that the consumer expectation test instruction was improper as a matter of law.  They contended that under the risk-benefit test, PCB failed to meet its initial burden of showing that its injury was proximately caused by the design of the fan.  They asserted that "[b]ecause plaintiff's

13

expert did not identify a design defect, and plaintiff presented no other evidence to show how the fan's design injured plaintiff, plaintiff failed to carry its burden and defendants are entitled to judgment."

B. *Defendants Argued That Special Instruction No. 1's Replacement Cost Measure of Damages Was Erroneous as a Matter of Law*

In their motion for new trial, defendants contended that Special Instruction No. 1's replacement cost measure of damages was erroneous as a matter of law. Defendants argued that because the lost original compositions and sound samples have an ascertainable market value, California law requires the amount of damages to be based on fair market value. Defendants argued that the jury's award for lost compositions and sound samples was excessive. Defendants pointed out that PCB could have registered its original compositions and presented evidence of past earnings on royalties. Defendants asserted that PCB's sound samples have a market value because many of the sounds were purchased as a "box set" or as pre-installed samples.

In their motion for JNOV, defendants similarly contended that fair market value rather than replacement cost was the correct measure of damages for the loss of personal property. Defendants argued that JNOV should be granted as to the 683 lost original compositions and 42,060 lost sound samples because, in light of PCB's failure to present any evidence of their fair market value, PCB was precluded from recovering any damages as to those items.

C. *PCB Opposed the Motions for New Trial and JNOV, Arguing the Instruction on the Consumer Expectation Test Was Proper; That Liability Was Properly Based on the Breach of Warranty Findings; That Replacement Cost Damages Were Properly Awarded Under Special Instruction No. 1*

In opposition to the motions for new trial and JNOV, PCB argued the instruction on the consumer expectation test was proper, there was no legal error, and there was

14

sufficient evidence to support the verdict. PCB contended the consumer expectation test is applicable where a fan, during normal usage, overheats and catches on fire. Under such circumstances, an ordinary consumer is qualified to know that the fan failed to meet minimum safety standards.

In addition, PCB argued the liability verdict was properly supported by the jury's alternative breach of warranty finding, which defendants did not mention in their motions for new trial and JNOV.

Finally, PCB contended the jury properly awarded replacement cost damages under Special Instruction No. 1. (Citing *Kimes v. Grosser* (2011) 195 Cal.App.4th 1556; *Zvolanek v. Bodger Seeds*, *Ltd.* (1935) 5 Cal.App.2d 106; *Willard v. Valley Gas & Fuel Co.* (1915) 171 Cal. 9 [disapproved on another ground in *Showalter v. Western P. R. Co.* (1940) 16 Cal.2d 460, 465-467].) PCB argued that Fisher's and Arem's testimony supported the jury's finding that there was no readily ascertainable market value for the lost original compositions and sound samples, which PCB would have to reproduce in order to create original works for motion pictures, video games, and other media. Under Special Instruction No. 1, the use of the replacement cost measure of damages was appropriate and the award, which was less than the amount requested, was not excessive.

## VII.   The Order Granting a New Trial

The trial court granted the motion for new trial. We quote the order in full because its language is relevant to our determination that the motion was granted on the single ground that the evidence was insufficient to support the verdict. The order stated:

"The motion for new trial is granted.

"The law regarding new trial is found in CCP 657. That section reads in pertinent part, 'A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision . . . unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision.'

15

"In the instant case the jury clearly should have reached a different verdict or decision for three reasons.  First, Plaintiff never showed a design or manufacturing defect in the table fan.  Second, the jury mistakenly applied the consumer expectation test for determining a design or manufacturing defect, instead of the risk benefit test.  Third, the amount of damages awarded was excessive.  As a result, Defendants were prejudiced.

"a)     Evidence of Product Design or Manufacturing Defect:
"Plaintiff presented little or no evidence showing that the design or manufacture of the product was defective.  He could not describe what defect in the fan caused the fire.  Plaintiff's expert said only that the motor [overheated] because it was defective, and it was defective because it overheated.  Such circumlocution did not explain the product's defect in design or manufacture.

"b)     consumer expectation test vs. risk benefit test:
"The consumer expectation test was the wrong test to apply under the facts of this case because an ordinary consumer would have no basis for forming any safety assumptions about the design or manufacture of the lightweight table fan when used for some 3,000 hours [nonstop] in a [commercial] setting to cool a space overheated by electronic equipment.

"1.     Under the risk benefit test that should have been applied here, Plaintiff had the burden to show that its injury was proximately caused by the fan's design or manufacture.  However, Plaintiff's expert could not identify any defect in the fan.

"a.     If plaintiff's own electrical engineering expert could not describe what defect in the fan [caused] the fire, how can a lay juror be expected to make such a determination?

16

"c)     The excessive Damage Award:

"The damages awarded for lost compositions and sound samples were excessive. The jury applied the wrong measure of damages, using replacement cost instead of fair market value.

"1.     Fair Market Value:
         "Plaintiff's music business expert, David Fisher, testified that the proper measure of damages for musical works is fair market value. He said royalties are tracked by Broadcast Music, Inc. ('BMI'), and the American [Society] of Composers, Authors and Publishers ('ASCAP') based on past earnings.  However, Plaintiff presented no evidence of these.

"2.     Replacement cost:
         "The only figures the jury heard regarding value of the lost works was the cost to replace them, so they mistakenly believed that replacement cost[] was the proper measurement of the damages, which led to a clearly erroneous result.

                  "a.     There was evidence of 683 compositions and 42,060 sound samples, and the jury awarded $5.46 million to replace these.

"d)     The result was prejudicial because it was reasonably probable that a result more favorable to Defendants would have been reached in the absence of the error.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

17

"The Motion for Judgment [Notwithstanding] The Verdict is moot by virtue of the above ruling."

## VIII.  The Appeal and Cross-appeal

Plaintiff timely appealed from the order granting a new trial.  (Code Civ. Proc., § 904.1, subd. (a)(4).)  Defendants timely cross-appealed from both the judgment and the order denying the motion for JNOV.  (Code Civ. Proc., § 904.1, subd. (a)(1), (4).)[6]

## DISCUSSION

## I.    The Order Granting a New Trial Must Be Reversed Because It Fails to Comply With the Mandatory Statutory Requirements

In the following sections, we (1) discuss the mandatory statutory requirements for a new trial order; (2) determine that the trial court granted a new trial on the sole ground that the evidence was insufficient to support the verdict; and (3) conclude that the trial court's stated reasons for finding that the jury should have reached a different verdict were legally erroneous.

### A.    The Mandatory Statutory Requirements

We begin by noting that "courts have no *inherent* power to grant a new trial: '[t]he right to a new trial is purely statutory.'  (*Fomco*, *Inc. v. Joe Maggio*, *Inc.* [(1961)] 55 Cal.2d 162, 166.)  Because the right to a new trial 'finds both its source and its limitations in the statutes . . . , the procedural steps prescribed by law . . . are *mandatory*

---

[6]    While the appeal was pending, we received notice that MJC had filed a petition for bankruptcy in the United States Bankruptcy Court for the Central District of California pursuant to Chapter 11 of the United States Bankruptcy Code on December 10, 2013 (case No.:  2:13-bk-39097-SK).  On February 25, 2014, we issued an order staying all proceedings in this matter.  After we were informed of the bankruptcy court's March 12, 2014 order approving a stipulation for relief from the automatic stay (11 U.S.C. § 362), we vacated the order staying all proceedings and scheduled oral argument.

and must be *strictly followed*.'  (*Mercer v. Perez* (1968) 68 Cal.2d 104, 118, citation omitted, italics added; see *Pacific Trends Lamp & Lighting Products*, *Inc. v. J. White Inc*. (1998) 65 Cal.App.4th 1131, 1135.)"  (*In re Marriage of Herr* (2009) 174 Cal.App.4th 1463, 1471.)

Code of Civil Procedure section 657 (section 657) allows the court to grant a new trial on all or part of the issues "for any of the following causes, materially affecting the substantial rights of such party:  [¶]  . . .  [¶]  5. Excessive or inadequate damages.  [¶] 6. Insufficiency of the evidence to justify the verdict or other decision, or the verdict or other decision is against law.  [¶]  7. Error in law, occurring at the trial and excepted to by the party making the application."

When the court grants a new trial, section 657 requires that the court specify not only the ground(s) upon which the motion is granted, but also the reason(s) for granting a new trial upon each ground stated.  Section 657 prohibits the court from granting a new trial on the ground of insufficient evidence or excessive damages, "unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."  (§ 657.)

Generally, an appellate court must affirm the new trial order "if it should have been granted upon any ground stated in the motion, whether or not specified in the order or specification of reasons."  (§ 657.)  However, an appellate court may not affirm a new trial order on the ground of insufficient evidence or excessive or inadequate damages, unless such ground is stated in the order granting the motion.  (*Ibid.*)  Where a new trial is granted on the ground of insufficient evidence or excessive or inadequate damage, "it shall be conclusively presumed" on appeal "that said order as to such ground was made only for the reasons specified in said order or said specification of reasons, and such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons."  (*Ibid.*)

19

A new trial order is reversible if the trial court based the order "'exclusively upon an erroneous concept of legal principles applicable to the cause.'" (*Rickley v. County of Los Angeles* (2004) 114 Cal.App.4th 1002, 1008-1009.)

       B.       *The Trial Court Granted a New Trial on the Sole Ground That the*
                   *Evidence Was Insufficient to Support the Verdict*

We conclude the court granted a new trial on the sole ground that the evidence was insufficient to support the verdict. We base our conclusion on the opening paragraphs of the order.

The first paragraph of the order quotes the following language from section 657 regarding insufficiency of the evidence: "A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision . . . unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."

The second paragraph of the order lists three reasons why the jury clearly should have reached a different verdict: "In the instant case the jury clearly should have reached a different verdict or decision for three reasons. First, Plaintiff never showed a design or manufacturing defect in the table fan. Second, the jury mistakenly applied the consumer expectation test for determining a design or manufacturing defect, instead of the risk benefit test. Third, the amount of damages awarded was excessive. As a result, Defendants were prejudiced." The new trial order then discusses each of the three reasons in paragraphs "a," "b," and "c."

Based on the opening paragraphs and the language of the order as a whole, we conclude the new trial was granted on a single ground: insufficiency of the evidence to support the verdict. We construe the remainder of the order as a statement of reasons why the jury clearly should have reached a different verdict. Those reasons do not constitute additional grounds for granting a new trial.

Admittedly, the order is somewhat ambiguous in at least two respects. In the following sections, we explain why, notwithstanding the ambiguous language of the order, the court did *not* grant a new trial on the grounds of excessive damages or instructional error.

1. <u>The Court Did Not Grant a New Trial on the Ground of Excessive Damages</u>

In listing the reasons why the jury should have reached a different verdict, the order stated that the amount of damages was excessive. Because excessive damages is a *ground* for granting a new trial (§ 657, subd. (5)), the parties contend that a new trial was granted on the additional *ground* of excessive damages. We disagree with this contention in light of paragraph "c" of the order.

In paragraph "c" of the order, the court tied its statement regarding excessive damages to the jury's use of the wrong measure of damages, stating: "The damages awarded for lost compositions and sound samples were excessive. The jury applied the wrong measure of damages, using replacement cost instead of fair market value." The court then made two additional statements: (1) although PCB could have provided evidence of fair market value based on royalty earnings, PCB failed to produce such evidence; and (2) the only evidence that PCB provided as to the value of the lost works was the "cost to replace them, so [the jury] mistakenly believed that replacement costs was the proper measurement of the damages, which led to a clearly erroneous result."

By awarding damages of $210,000 and $5.25 million for the lost compositions and sound samples, the jury implicitly adopted PCB's view, as set forth in Special Instruction No. 1, that the market value of the lost compositions and sound samples was uncertain and, therefore, a replacement cost measure of damages was appropriate. In granting a new trial on damages, the court did not find the jury's award exceeded the replacement cost of the lost compositions and sound samples. Instead, the court found the award was excessive because the jury applied the wrong measure of damages. We therefore conclude the court was *not* granting a new trial on the *ground* of excessive damages, but

21

was explaining why the jury should have reached a different verdict by applying a different measure of damages.

> 2. The Court Did Not Grant a New Trial on the Ground of Instructional Error

In listing the reasons why the jury should have reached a different verdict, the order stated that the jury applied the wrong test for design defect. Because the jury was following the consumer expectation test instruction that was given by the trial court, defendants contend that the motion for new trial was granted on the additional ground of instructional error. Defendants argue that the trial court properly granted a new trial because of instructional error in applying the consumer expectation test to the question of designing a fan that is to be used in a professional sound studio to cool electronic equipment.

However, we find no mention of instructional error in the new trial order. The order does not state that the *court* erred in instructing the jury. On the contrary, the order states that the *jury* erred in applying the wrong design defect test. We therefore conclude that the court did not grant a new trial on the ground of instructional error.

Moreover, even assuming the trial court found it had erred in giving the consumer expectation test instruction, we would disagree. In our view, the consumer expectation test instruction was proper under the settled facts of this case.

As the Supreme Court explained in *Soule*: "In some cases . . . , 'ordinary knowledge . . . as to . . . [the product's] characteristics' (Rest.2d Torts . . . , § 402A, com. i., p. 352) may permit an inference that the product did not perform as safely as it should. *If* the facts permit such a conclusion, and *if* the failure resulted from the product's design, a finding of defect is warranted without any further proof. The manufacturer may not defend a claim that a product's design failed to perform as safely as its ordinary consumers would expect by presenting expert evidence of the design's relative risks and benefits." (*Soule*, *supra*, 8 Cal.4th at p. 566, fn. omitted.) The court further stated: "For example, the ordinary consumers of modern automobiles may and do expect that such

22

vehicles will be designed so as not to explode while idling at stoplights, experience sudden steering or brake failure as they leave the dealership, or roll over and catch fire in two-mile-per-hour collisions. If the plaintiff in a product liability action proved that a vehicle's design produced such a result, the jury could find forthwith that the car failed to perform as safely as its ordinary consumers would expect, and was therefore defective." (*Id.* at p. 566, fn. 3.)

In this case, PCB's evidence of causation, which was accepted by the jury and is not at issue on appeal, showed that the fan had overheated and caught on fire while being used in a reasonably foreseeable manner. We conclude that under these settled facts, the ordinary consumer could form a reasonable minimum safety expectation that the fan would not overheat and catch on fire. (See *Soule*, *supra*, 8 Cal.4th at p. 566.) The consumer expectation test instruction was therefore appropriate under the established facts of this case.

C.    *The Trial Court's Stated Reasons for Finding the Jury Should Have Reached a Different Verdict Were Legally Erroneous*

Our review of the order granting a new trial is limited to the ground of insufficiency of the evidence that is specified in the order. Section 657 mandates that in an appeal from an order granting a new trial on the ground of insufficient evidence, "it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons, and such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons." (§ 657.)

We conclude the trial court's stated reasons for granting a new trial based on insufficient evidence were legally erroneous.

1.　　PCB Was Not Required to Show a Design or Manufacturing Defect
Under a Risk-Benefit Theory on Which the Jury Was Not Instructed

As its first reason for granting a new trial based on insufficient evidence, the trial court stated that PCB's expert witness Bennett did not identify the design or manufacturing defect that caused the fire. Bennett, the trial court noted, "said only that the motor [overheated] because it was defective, and it was defective because it overheated. The circumlocution did not explain the product's defect in design or manufacture."

As PCB correctly contends, the trial court's remarks are relevant to the risk-benefit theory of design defect on which the jury was *not* instructed. Under the consumer expectation test instruction that *was* given, if the jury found that the fan overheated and caught on fire, it could find that the fan did not perform as safely as the ordinary consumer would expect, and was therefore defective. (See *Soule*, *supra*, 8 Cal.4th at p. 566.) Accordingly, the trial court's remarks concerning Bennett's expert testimony do not reflect on the sufficiency of the evidence to support a verdict under the consumer expectation test instruction that was given.

On appeal, it is our obligation to review "the sufficiency of the evidence to support a verdict under the law stated in the instructions given, rather than under some other law on which the jury was not instructed. (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1535.) . . . The jury's responsibility is to decide factual issues and return a verdict in accordance with the law as instructed by the court. (*Null*, *supra*, at p. 1534; *Richmond v. Dart Industries*, *Inc*. (1987) 196 Cal.App.3d 869, 877.)" (*Bullock v. Philip Morris USA*, *Inc.* (2008) 159 Cal.App.4th 655, 674-675.) We thus find the trial court's first reason—that PCB failed to prove the existence of a design or manufacturing defect under the risk-benefit test—to be legally erroneous because the jury was not instructed on the risk-benefit test.

## 2. The Jury Did Not Err in Failing to Apply a Risk-Benefit Test

As its second reason for granting a new trial based on insufficient evidence, the trial court stated that the jury had applied the "wrong test." It faulted the jury for applying the consumer expectation test because "an ordinary consumer would have no basis for forming any safety assumptions about the design or manufacture of the lightweight table fan when used for some 3,000 hours [nonstop] in a [commercial] setting to cool a space overheated by electronic equipment." It stated that "[u]nder the risk benefit test that should have been applied here, Plaintiff had the burden to show that its injury was proximately caused by the fan's design or manufacture. However, Plaintiff's expert could not identify any defect in the fan." It pointed out that "[i]f plaintiff's own electrical engineering expert could not describe what defect in the fan [caused] the fire, how can a lay juror be expected to make such a determination?"

As previously discussed, however, the jury did not err in applying the consumer expectation test, which was the sole design defect instruction given to the jury. Under the consumer expectation test, the question "whether a product's design and performance met the informed expectations of the ordinary consumer is a question distinct from, even if derivative of, the factual issues of what that design was and how it functioned." (*Bresnahan v. Chrysler Corp.* (1995) 32 Cal.App.4th 1559, 1568-1569.) PCB's decision to present no expert testimony regarding a design defect in the fan was intentional because PCB was not relying on the risk-benefit test. "Risk-benefit weighing is not a formal part of, nor may it serve as a 'defense' to, the consumer expectations test. (*Soule*, *supra*, 8 Cal.4th at p. 566.)" (*Id.* at p. 1569.) Because PCB's expert was not asked to analyze the design of the fan, the inference drawn by the trial court—that PCB's expert could not identify a defect—was erroneous.

## 3. The Jury Did Not Err in Applying Special Instruction No. 1, Which Permitted an Award Based on Replacement Cost

As its third reason for granting a new trial based on insufficient evidence, the trial court stated that "[t]he jury applied the wrong measure of damages, using replacement

25

cost instead of fair market value." The trial court also stated that PCB's failure to register its original compositions, present evidence of past royalty income, or provide any evidence of fair market value had caused the jury to "mistakenly believe[] that replacement cost[] was the proper measurement of the damages, which led to a clearly erroneous result."

We do not agree that the jury applied the wrong measure of damages. According to Special Instruction No. 1, the jury was allowed to decide whether the market value of the lost original compositions and sound samples was uncertain. We conclude that PCB's failure to provide evidence of market value did not preclude its recovery of replacement costs.

PCB provided substantial evidence that the lost original compositions and sound samples were of special value to the owner. As to the sound samples, Arem explained that because the sounds were uniquely directed, recorded, and developed over the course of 25 years and at diverse locations around the world, he could not replace them by simply purchasing a commercial sound library. He stated that even if he could purchase such a library, it would not meet his standards and would have to be altered to suit his commercial needs. As to the original compositions, Fisher explained that it would be difficult to measure the fair market value of the unregistered compositions (which comprised the vast majority of the compositions) because "you can't price a song." Arem testified that without the multitracks of the original compositions, PCB could not use the compositions to produce new works.

Based on Fisher's and Arem's testimony, a jury could reasonably find that the lost compositions and sound samples had a peculiar value to PCB that was legally compensable even if the lost compositions and sound samples had no market value. (See Civ. Code, § 3333 ["For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not"]; Evid. Code, § 823 ["the value of property for

26

which there is no relevant, comparable market may be determined by any method of valuation that is just and equitable"].)

*Kimes v. Grosser*, *supra*, 195 Cal.App.4th 1556, is instructive. That case involved an injured cat, which the owner (Kimes) conceded had no market value. Kimes sued his neighbor (Grosser) to recover veterinary and other expenses that were incurred to care for the cat after it was allegedly shot by Grosser. When Grosser successfully moved to exclude evidence of expenses in excess of the cat's market value, which was negligible, Kimes effectively conceded the cat had no market value that would justify the expenses of a trial. In Kimes's appeal from the judgment of dismissal entered on his failure to prosecute, the appellate court reversed. The appellate court held that because Kimes was "not plucking a number out of the air for the sentimental value of damaged property," but was seeking "to present evidence of costs incurred for [the cat's] care and treatment by virtue of the shooting," the evidence of Kimes's veterinary and other expenses was admissible as proof of compensable damages. (*Id.* at p. 1561.) In support of its decision, the court cited Civil Code section 3333 and Evidence Code section 823. (*Id.* at pp. 1561-1562.)

In this case, the replacement cost measure of damages provided a just and rational way of compensating PCB for the loss of its original compositions and sound samples. As the court in *Kimes* stated, "where the property has no market value, the general rule limiting recovery to the loss of that value cannot apply, because it would invariably preclude any recovery. In such cases, the property's value '"must be ascertained in some other rational way, and from such elements as are attainable."' [Citation.]" (*Kimes*, *supra*, 195 Cal.App.4th at p. 1561.) We therefore find the trial court's third reason—that the jury erroneously applied the replacement cost measure of damages—to be legally erroneous.

D. *The New Trial Motion Failed to Challenge the Breach of Warranty Verdict*

PCB contends that because the jury's breach of warranty verdict was unchallenged by the motion for new trial, the trial court erred in granting a new trial on that issue. We conclude that PCB is correct.

The order is not sustainable as an order granting a new trial on the breach of warranty claim, because the order does not include a specification of reasons for granting a new trial as to that issue. "An order granting a new trial in which the trial court sets out adequate reason[s] for finding the verdict wrong on only one issue of several submitted to the jury, is erroneous. To grant a new trial in such a situation, the trial court must adequately specify reasons why the evidence is insufficient on all issues presumably found by the jury to support the verdict." (*Previte v. Lincolnwood, Inc.* (1975) 48 Cal.App.3d 976, 987.)

## II. The Cross-appeal Lacks Merit

When an order granting a new trial is reversed, the judgment will be reinstated automatically. (*Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 63.) We therefore address defendants' cross-appeal from the judgment and the order denying the motion for JNOV.

In their cross-appeal from the judgment, defendants contend that if this court "reverses the trial court's order granting a new trial, the original judgment should nonetheless be reversed and a new trial granted by this court, for the reasons set forth in the respondents' brief." However, it is unclear what defendants are arguing. If their contention is merely that the motion for new trial was properly granted, we have already considered and rejected that contention above. If they are claiming that it was erroneous to instruct the jury on the consumer expectation test, they have failed to discuss why the error was prejudicial in light of the jury's breach of warranty verdict, which requires no finding of a design defect. To the extent they are arguing the damages award was excessive, we have addressed that contention above.

28

In their cross-appeal from the order denying the motion for JNOV, defendants contend they are entitled to partial JNOV on PCB's design defect claim. We conclude the contention lacks merit because there is no explanation as to why the denial of a partial JNOV was prejudicial in light of the jury's breach of warranty verdict, which requires no finding of a design defect.

## DISPOSITION

The order granting a new trial is reversed. The order denying defendants' motion for judgment notwithstanding the verdict is affirmed. The judgment is reinstated and affirmed. PCB is entitled to recover its costs on appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EDMON, J.*

We concur:

WILLHITE, Acting P. J.

MANELLA, J.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.